1   Edward W. Swanson, SBN 159859
    August Gugelmann, SBN 240544
2   SWANSON & McNAMARA LLP
    300 Montgomery Street, Suite 1100
3   San Francisco, California 94104
    Telephone: (415) 477-3800
4   Facsimile: (415) 477-9010

5   Attorneys for Defendant MICHAEL ARNOLD

6

7

8

9

10                      UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,              No. CR 10-0642 CRB

13                      Plaintiff,         **NOTICE OF MOTION AND MOTION
                                           TO DISMISS; MEMORANDUM OF**
14       vs.                               **POINTS AND AUTHORITIES**

15  MICHAEL ARNOLD, et al.,                Date:   November 10, 2010
                                           Time:   2:15 p.m.
16                      Defendants.        Court:  Hon. Charles R. Breyer

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

3

NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6

II.     STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7

III.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

8

        A.      The Indictment Fails to State an Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

9

        B.      The Indictment Fails To Plead All The Required Elements Of The Charged
                Offenses, Thus Each Count Must Be Dismissed . . . . . . . . . . . . . . . . . . . . . . . . 14

10

IV.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2 **CASES**

3 *Kolender v. Lawson*, 461 U.S. 352 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9n.3

4 *Oregon v. Gonzales*, 546 U.S. 243 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 11, 12, 13

5 *Skilling v. United States* 130 S.Ct. 2896 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

6 *Smith v. Goguen*, 415 U.S. 566 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9n.3

7 *United States v. Du Bo*, 186 F.3d 1177 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14, 15

8 *United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . *passim*

9 *United States v. Fuchs*, 467 F.3d 889 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10 *United States v. Lovern*, 590 F.3d 1095 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11

11 *United States v. Moore*, 423 U.S. 122 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 11

12

13 **STATUTES, REGULATIONS, and RULES**

14 18 U.S.C. § 1956 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15 21 U.S.C. § 801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

16 21 U.S.C. § 822 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

17 21 U.S.C. § 824 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18 21 U.S.C. § 829. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10

19 21 U.S.C. § 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

20 21 U.S.C. § 842 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

21 21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16

22

23 21 C.F.R. § 1306.04 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

24

25 Fed. R. Crim. P. 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

26 Fed. R. Crim. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE**

PLEASE TAKE NOTICE that on November 10, 2010 at 2:15 p.m., or as soon as the matter may be heard before the Honorable Charles R. Breyer, defendant Michael Arnold will and hereby does move the Court to dismiss the indictment and all charges contained therein pertaining to him.  This motion is based on the instant notice, Federal Rule of Criminal Procedure 12(b)(3), the attached memorandum of points and authorities, the files and records in this matter, and upon such argument as may be submitted at the hearing on this motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

The Court should dismiss the indictment as it pertains to Mr. Arnold because it fails to state an offense.  Specifically, the Controlled Substances Act ("CSA"), 21 U.S.C. sections 801 *et seq.*, as interpreted by the Ninth Circuit, does not criminalize the conduct alleged in the indictment.  Because the drug charges fail to state an offense, the attendant conspiracy and money laundering charges, based entirely on the government's misconceptions about the drug laws, must also be dismissed.  Moreover, the indictment fails to allege an essential element of each of the charged counts, and therefore each must be dismissed.  Finally, to the extent the Court finds the government has alleged an offense against Mr. Arnold, the federal regulation upon which the government seeks to impose criminal liability here is unconstitutionally vague as applied to the conduct Mr. Arnold is alleged to have engaged in, and thus a violation of his right to due process.

**I.     INTRODUCTION**

This is not a typical drug case.  This is a case about non-narcotic controlled substances being dispensed by licensed pharmacists pursuant to prescriptions written by licensed doctors based on medical information provided by the recipients of the medications.  What converts this from a routine medical process to an illegal drug distribution ring, according to the government's theory, is that the doctors' prescriptions were based entirely on the review of medical questionnaires submitted via the internet.

The government disapproves of this practice.  However, until April of last year, when the Ryan Haight Online Consumer Protection Act of 2008 became effective, no federal law

**Michael Arnold's Motion to Dismiss**
*United States v. Napoli, et al.*, CR 10-0642 CRB     1

1   explicitly prohibited dispensing controlled substances pursuant to such a practice.  The

2   government alleges that Mr. Arnold owned an operated a business that facilitated the above-

3   described practice.  The alleged conduct in this case took place before passage of the Ryan

4   Haight Act.  Undeterred, the government charges Mr. Arnold with violations of 21 U.S.C.

5   section 841(a) (unlawful distribution of controlled substances) and related conspiracy and money

6   laundering counts, on the theory that issuing prescriptions without an in-person physical

7   examination violates the vague terms of 21 C.F.R. section 1306.04, which requires that

8   prescriptions be issued "for a legitimate medical purpose by an individual practitioner acting in

9   the usual course of his professional practice."

10          To be sure, in some circumstances doctors, pharmacists, and their business associates can

11   be prosecuted  under § 841(a) and 21 C.F.R. section 1306.04.  However, under clear Supreme

12   Court and Ninth Circuit law, such prosecutions can proceed only where the doctors writing the

13   prescriptions have completely abdicated their professional duties and are acting like simple

14   "drug pushers."  *See United States v. Feingold*, 454 F.3d 1001, 1010 (9th Cir. 2006); *see also*

15   *United States v. Moore*, 423 U.S. 122 (1975).  Moreover, the Supreme Court has held that the

16   Attorney General has no "authority to declare an entire class of activity outside 'the course of

17   professional practice,' and therefore a criminal violation of the CSA."  *See Oregon v. Gonzales*,

18   546 U.S. 243, 262 (2006) (quoting 21 C.F.R. § 1306.04).

19          In light of these standards, the indictment fails to state an offense, because it alleges

20   nothing more than that Mr. Arnold facilitated dispensation of non-narcotic controlled substances

21   based on doctors' reviews of medical questionnaires instead of in-person medical examinations.

22   To allow this prosecution to proceed on the basis of the government's disagreement with a

23   prescription methodology and the vague terms of 21 C.F.R. section 1306.04 – in the absence of

24   any allegation that the doctors involved were acting as mere "drug pushers" – and that Mr. Arnold

25   knew that – would violate Mr. Arnold's Fifth Amendment due process right against prosecutions

26   based on criminal laws whose "standardless sweep allows policemen, prosecutors, and juries to

27   pursue their personal predilections" (*Smith v. Goguen*, 415 U.S. 566, 575 (1974)), thereby

28

"encourag[ing] opportunistic and arbitrary prosecutions." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

Finally, in addition to this fundamental flaw in the government's theory of the case, the indictment must also be dismissed for failure to allege an essential *mens rea* element of each count. In 21 U.S.C. section 841 prosecutions involving dispensation of controlled substances pursuant to doctors' prescriptions, the government must prove "(1) that the practitioner distributed controlled substances, (2) that the distribution of those controlled substances was outside the usual course of professional practice and without a legitimate medical purpose, and (3) that the practitioner acted with intent to distribute the drugs **and with intent to distribute them outside the course of professional practice**." *Feingold*, 454 F.3d at 1008 (emphasis added). Here, the indictment fails to allege that the doctors issued prescriptions "with the intent to distribute [controlled substances] outside the usual course of professional practice" or that Mr. Arnold knew that the doctors were doing so. This is not a mere technicality; it is a violation of core protections guaranteed by the Fifth Amendment's grand jury requirement. *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999) (dismissing Hobbs Act conviction because indictment failed to allege an "implied" *mens rea* element). Such deficiencies cannot be cured by proof at trial or jury instructions, and they are not susceptible to harmless error analysis. *Id.* at 1180. Consequently, each of the section 841 counts must be dismissed, as well as the conspiracy and money laundering counts that are based on the same conduct.

## II.   STATEMENT OF ISSUES

1(a)   Whether the indictment fails to state an offense by alleging only that controlled substances were dispensed pursuant to doctor prescriptions issued after reviews of medical questionnaires instead of in-person examinations, and where the indictment fails to allege doctors were acting as mere "drug pushers" or that Mr. Arnold had knowledge that the doctors were acting as mere "drug pushers."

1(b)   Whether permitting a prosecution under 21 U.S.C. sections 841(a) and 846 (and the related money laundering charges under 18 U.S.C. section 1956(h)) alleging only that controlled substances were dispensed pursuant to doctor prescriptions issued after review of

1    medical questionnaires instead of in-person examinations (thus allegedly in violation of 21

2    C.F.R. section 1306.04), and where the indictment fails to allege doctors were acting as mere

3    "drug pushers" or that Mr. Arnold had such knowledge, violates Mr. Arnold's Fifth Amendment

4    protection from prosecution under vague criminal laws.

5            2.      Whether the indictment fails to allege an essential element of each of the charged

6    offenses, namely the *mens rea* element articulated in *Feingold* requiring the government to

7    allege and prove that doctors issued their prescriptions with the intent to distribute controlled

8    substances outside the course of professional practice.

9    **III.    ARGUMENT**

10           **A.      The Indictment Fails to State an Offense**

11           The indictment charges Mr. Arnold with six substantive counts and seeks criminal

12   forfeiture under two separate theories.  However, this is not a complicated case.  The

13   government's prosecution rests upon a faulty theory that a prescription for medication – here,

14   non-narcotic controlled substances consisting mainly of diet pills classified under Schedule IV of

15   the CSA (21 U.S.C. sections 801 *et seq.*) – is not valid without a face-to-face examination, thus

16   any dispensing of controlled substances under such a prescription constitutes a federal criminal

17   offense.

18           In order to realize its convoluted theory of criminal liability here, the government relies

19   on a vague *regulation* (21 C.F.R. section 1306.04) interpreting the term "prescription," in an

20   exception (21 U.S.C. sections 822(b) & 829) to the general federal criminal prohibition against

21   drug distribution (21 U.S.C. section  841).  Here's how the government's theory works: section

22   841 of Title 21 generally prohibits distribution and dispensation of controlled substances;

23   Sections 822(b) and 829(b) of the same title permit distribution or dispensation of Schedule III

24   or IV controlled substances with a written or oral prescription from a doctor holding a valid DEA

25   registration; the regulation at 21 C.F.R. section 1306.04 states that a "prescription for a

26   controlled substance to be effective must be issued for a legitimate medical purpose by an

27   individual practitioner acting in the usual course of his professional practice."  The government

28   alleges that Mr. Arnold operated a business that facilitated distribution of controlled substances

**Michael Arnold's Motion to Dismiss**
*United States v. Napoli, et al.*, CR 10-0642 CRB            4

to individuals who submitted "on-line questionnaires" describing their "medical history;" these questionnaires were then reviewed by licensed doctors with valid DEA registrations. According to the indictment, after doctors reviewed the questionnaires, approved prescriptions were submitted for fulfillment to licensed pharmacies with valid DEA registrations. While the government litters the indictment with innuendo – *see, e.g.,* Indictment at ¶ 16 (doctor "purported to review the on-line questionnaires and approve a prescription for the Controlled Substances"), *id.* at ¶ 17 ("After . . . physician authorized a purported prescription for the Controlled Substances, owners and employees of various fulfillment pharmacies . . . . filled and shipped the Controlled Substances"), *id.* at ¶¶ 14, 16, 17, 20, 21 (referring to recipients of prescription medications as "customers") – it does not allege that controlled substances were dispensed in the absence of a physician-approved prescription, that the physicians who authorized the prescriptions were not licensed, that the physicians who authorized the prescriptions did not, in fact, review the medical information provided by the patients, that the physicians who authorized prescriptions did not exercise appropriate medical judgment and decline prescriptions to inappropriate candidates, or that the pharmacies who filled the prescriptions were not licensed or permitted by law to do so.

Instead, the government stakes its case on the vague standard articulated in 21 C.F.R. section 1306.04 and makes the conclusory allegation that "several doctors . . . approved customer orders for controlled substances that were not for a legitimate medical purpose and when the doctor was not acting in the usual course of his or her professional practice." Indictment, ¶ 15. Wading into the vagaries of best medical practices, the government explains its theory that these prescriptions were not issued in compliance with the nebulous terms of the regulation because "[a]t no time during the questionnaire review process did . . . any . . . approving physician physically examine and obtain a complete medical history from the

customers.  Nor did . . . any . . . approving physician make any effort to confirm the accuracy of the information provided by the customers in the on-line questionnaires." [1] Indictment, ¶ 16.

These allegations are insufficient to state an offense under Ninth Circuit law.  This is not to say that medical practitioners and their associates cannot be prosecuted for issuing prescriptions in violation of 21 C.F.R. section 1306.04 , or for dispensing controlled substances based on such prescriptions.  Indeed, some courts have permitted prosecution based on allegations similar to those advanced here.  *See United States v. Lovern*, 590 F.3d 1095 (10th Cir. 2009);  *United States v. Fuchs*, 467 F.3d 889 (5th Cir. 2006).  However, the Ninth Circuit requires more for a prosecution under 21 C.F.R. section 1306.04 where the controlled substances

---

[1] Whatever import can be ascribed to the government's characterization of the people requesting the medications in this case as "customers," it must be noted that the same tacit accusation has been applied with equal force outside the Internet consultation world.   In a *New York Times* Op-Ed, Dr. Peter Salgo, a professor at the Columbia University College of Physicians and Surgeons, lamented the current state of the medical profession:

> The problem has been sneaking up on us for almost two decades. As health-care dollars became scarce in the 1980's and 90's, hospitals asked their business people to attend clinical meetings. The object was to see what doctors were doing that cost a lot of money, then to try and do things more efficiently. Almost immediately, I noticed that business jargon was becoming commonplace. "Patients" began to disappear. They were replaced by "consumers." They eventually became "customers."

> This may seem a trivial matter, but it is not. You treat "patients" as if they were members of your family. You talk to them. You comfort them. You take time to explain to them what the future may hold in store. Sometimes, that future will be bleak. But you assure them you will be there to help them face it.

> You treat "customers" quite differently. Customers are in your place of business to purchase health care. You complete the transaction such a relationship suggests: health care for money. And then they aren't your customers any more. Taken a step further, you can make the case that the less time you spend with your customers, the better your bottom line will be. This gets everyone's attention.

Peter Salgo, *The Doctor Will See You for Exactly Seven Minutes*, N.Y. Times, March 22, 2006, at A26.  Whether one believes Dr. Salgo's eponymous accusation about the inadequate length of the average "face-to-face [doctor] encounter," or any of his other complaints about current medical practices, to convert such arguments into allegations of violations of the federal criminal law cannot be permitted.  That is precisely what the government is trying to do here.

1    at issue were authorized by a licensed doctor and distributed by a licensed pharmacist.  *See*

2    *United States v. Feingold*, 454 F.3d 1001, 1010 (9th Cir. 2006) (doctor may be prosecuted under

3    section  841(a) only when his or her "actions completely betrayed any semblance of legitimate

4    medical treatment," and doctor acted as mere "drug pusher"; "even intentional malpractice" is

5    not a violation of section 841(a)).  As discussed below, *Feingold* represents the most faithful

6    reading of Congress's intent to limit CSA prosecutions involving dispensations based on

7    prescriptions and of the Supreme Court's seminal holding in this area, *United States v. Moore*,

8    423 U.S. 122 (1975), acknowledging these limitations.  In the light of the heightened standard

9    recognized in *Feingold*, it is unsurprising that, unlike the Tenth Circuit, the Ninth Circuit has

10   never authorized a prosecution based solely on the government's disagreement with a particular

11   medical practice for prescribing – and ultimately distributing – controlled substances.

12       There is no doubt the Department of Justice disfavors issuance of prescriptions based

13   solely on doctor review of medical questionnaires.  Face-to-face consultations with physicians

14   may be the ideal, and even the way most people still envision medical treatment.  But since the

15   advent of direct-to-consumer broadcast advertising of controlled substances (made possible by a

16   Food and Drug Administration reinterpretation of a regulation in 1999) telling us to "ask our

17   doctor" about this drug or that, and medical information Web sites, such as WebMD, teaching us

18   that we too can participate in our own diagnosis and treatment, not to mention internet

19   technology vastly changing the way people communicate, it is unrealistic to expect medical

20   treatment – even as it pertains to prescribing controlled substances – to remain unaltered.

21   Doctors have become gatekeepers, often authorizing prescriptions for appropriate candidates

22   seeking the medications television commercials have told them to try, and declining

23   prescriptions in medically inappropriate cases.  For better or worse, it has become the norm for

24   patients to come to their doctors requesting what they want instead of waiting for what the doctor

25   gives them.

26       This is not to argue in favor of recent medical trends, but simply to provide the backdrop

27   against which this prosecution unfolds.  Mr. Arnold does not submit that old laws cannot fit new

28   circumstances or that the government is powerless to combat novel practices that violate existing

**Michael Arnold's Motion to Dismiss**
*United States v. Napoli, et al.*, CR 10-0642 CRB        7

1   laws.  However, statutes can be stretched only so far, and the Constitution imposes certain

2   unbendable limitations.  Had Congress desired to pass a law prohibiting issuance of prescriptions

3   for controlled substances in the absence of a face-to-face examination, it would have been well

4   within its power, but Congress refused to do so on numerous occasions prior to and during the

5   period covered by this indictment.[2]  It was not until 2008 – after the conduct alleged here – that

6   Congress enacted legislation governing use of the internet in prescribing controlled substances

7   and requiring in-person examinations for prescription of controlled substances.  *See* Ryan Haight

8   Online Pharmacy Consumer Protection Act of 2008, codified in relevant part at 21 U.S.C. §

9   841(h).  The Act's legislative history demonstrates the conduct alleged here was not a crime

10  before April 13, 2009.  *See* September 23, 2008 Congressional Budget Office report on H.R.

11  6353 (Senate Bill 980, which became the Ryan Haight Act, "would establish new crimes and

12  increased penalties for activities relating to illegal use of controlled substances.  Because the bill

13  would establish new offenses, the government would be able to pursue cases that it otherwise

14  would not be able to prosecute.") (available at http://www.cbo.gov/ftpdocs/97xx/doc9787/

15  hr6353.pdf).  This makes abundantly clear that Congress was capable of prohibiting specific

16  conduct when it chose.  Moreover, passage of the Ryan Haight Act indicates that this case,

17  which alleges conduct by Mr. Arnold prior to April 2007, is sure to be one of the last brought

18  under the vague standard in 21 C.F.R. section 1306.04.  The law is now clear regarding the

19  legality of prescriptions issued based solely on medical questionnaires submitted online.  Prior to

20  the Ryan Haight Act it was not.

21

22  _____

23      [2] To the extent that Congress considered legislation expressly regulating the practice of
    issuing and filling prescriptions on the basis of Internet consultations, prior to and during the time
24  period encompassed by this indictment, it rejected such legislation.  *See, e.g.,* S. 399 (109th Cong.)
    (2006) (requiring in-person medical examination for valid prescription of controlled substance); S.
25  3884 (109th Cong.) (same); H.R. 840 (109th Cong.) (2006) (same); H.R. 3880 (108th Cong.) (2004)
    (imposing in-person examination requirement for prescription of controlled substances); S. 2464
26  (108th Cong.) (2004) (same); H.R. 840 (109th Cong.); H.R. 4990 (2002) (requiring the name of the
    doctor and pharmacy to be prominently displayed on prescriptions); S. 3208 (2000) (proposed
27  amendment to Food, Drug, and Cosmetic Act that specifically addressed Internet prescribing).

28

1    Under Ninth Circuit law governing the time period relevant to this case, the government

2    may not charge a section 841(a) offense involving controlled substances dispensed by licensed

3    pharmacists pursuant to prescriptions issued by licensed doctors unless it alleges (1) that the

4    medical practitioners completely abdicated their professional duties and acted merely as "drug

5    pushers," and (2) that involved non-practitioners knew this.  *Feingold*, 454 F.3d at 1010.[3]

6    Moreover, the federal government may not impose its preferred medical practices on

7    practitioners (even where controlled substances are involved) when criminal sanctions hang in

8    the balance.  *Oregon v. Gonzales*, 546 U.S. 243, 262 (2006) (stating the Attorney General has no

9    "authority to declare an entire class of activity outside 'the course of professional practice,' and

10   therefore a criminal violation of the CSA") (quoting 21 C.F.R. § 1306.04).

11       In short, the government is prohibited from bringing criminal charges based solely on its

12   condemnation of a particular medical practice – *e.g.*, distribution of diet pills based on review of

13   medical questionnaires.  However, that is what the government attempts in this case.  Under the

14   government's theory, there is nothing to stop it from prosecuting a doctor who prescribed

15   controlled substances because that doctor failed to verify information on a patient's medical

16   history questionnaire (a practice unheard of in modern medicine), or because the government

17   didn't approve of the length of the in-person examination leading to that prescription, or any of

18

19

20       [3] This is because Congress did not intend to force practitioners to practice at their peril in
21   prescribing controlled substances, and in fact, refused to permit criminal sanctions to turn on a
     vague standard almost identical to 21 C.F.R. section 1306.04.  *See* H.R. Rep. No. 1444, 91st
22   Cong., 2nd Sess., 1970 U.S.C.C.A.N. 4566, 4581 (in adopting CSA Congress rejected a Bureau
     of Narcotics regulation invalidating methadone prescriptions issued "not in the course of
23   professional treatment" because under this standard "[t]he practicing physician has thus been
24   confused as to when he may prescribe . . . ," and been subject to criminal prosecution when the
     physician's "methods of prescribing narcotic drugs have not conformed to the opinions of federal
25   prosecutors of what constitutes *appropriate methods of professional practice*.") (emphasis
     added).  To the extent Congress's intent is in doubt, the rule of lenity requires such doubt be
26   resolved in favor of defendants because of the constitutional prohibition against criminal laws
27   whose "standardless sweep allows policemen, prosecutors, and juries to pursue their personal
     predilections" (*Smith v. Goguen*, 415 U.S. 566, 575 (1974)), thereby "encourag[ing]
28   opportunistic and arbitrary prosecutions."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

1    the myriad other ways a medical examination could be criticized.[4]  Basing a prosecution on such

2    whims is the very antithesis of the federal government's role in the practice of medicine, and it

3    runs afoul of Congress's intent in enacting the CSA, of clear Ninth Circuit precedent, and of the

4    Due Process Clause's notice requirement.

5        This is not to say the government has no means of regulating distribution of controlled

6    substances.  On the contrary, the CSA establishes a comprehensive regime under which the

7    government may revoke the DEA registration of any doctor or pharmacist at a moment's notice.

8    *See* 21 U.S.C. § 824(a)(4) (permitting suspension or revocation of DEA registration upon finding

9    that physician engaged in acts "inconsistent with the public interest"); 21 U.S.C. § 824(d)

10   (permitting immediate suspension upon finding of an "imminent danger to the public health or

11   safety").  The government can also punish doctors (and presumably their associates) who write

12   improper or irregular prescriptions.  *See* 21 U.S.C. § 842(a)(1) (providing civil penalties and

13   misdemeanor criminal penalties for physicians who write prescriptions in violation of 21 U.S.C.

14   § 829).  The government thus could have revoked the prescription-writing privileges of the

15   doctors and the prescription-filling privileges of the pharmacies involved in the business Mr.

16   Arnold is alleged to have run.  Yet, despite knowing of the business since, at the latest,

17   November 18, 2005 (the date of the first controlled substance purchase by a government agent),

18   the government elected not to interfere with the DEA registrations of the medical professionals

19   allegedly involved.  Had the government done that, either the business would have been forced

20   to close down, or it would have had to sell controlled substances without prescriptions in clear

21   violation of the drug laws.  *See Feingold*, 454 F.3d at 1005 (doctor convicted based, in part, on

22   evidence he continued to prescribe narcotic Schedule II controlled substances after legal

23   authority to issue such prescriptions was revoked).  Because the government never did so, and

24   because the business at issue here is not alleged to have sold controlled substances without a

25

26       [4] Moreover, under the government's theory of this case, and in the absence of the allegations
     required by *Feingold*, not only are the doctors who issued the prescriptions, the pharmacists who
27   filled them, and the business professionals who facilitated the process criminals, each of the
     individuals who purchased medications through this method is as much a criminal as if he or she had
28   purchased controlled substances on the street with no prescription at all.

**Michael Arnold's Motion to Dismiss**
*United States v. Napoli, et al.*, CR 10-0642 CRB        10

1   prescription, the government is left to its theory that the alleged business practices violated the

2   vague terms of 21 C.F.R. section 1306.04.

3          Thus, the government must meet the heightened pleading and proof standards of

4   *Feingold*.  In that case, Dr. Feingold was convicted of 185 counts of violating 21 U.S.C. section

5   841.  In the light of his egregious behavior, including prescribing 2,000 pills to a single patient in

6   one month ("despite the fact that the recommended maximum dosage would have allowed the

7   consumption of only 186"), and "liberally" providing prescriptions for Schedule II pain pills,

8   such as Hydrocodone, Vicodin, and Oxycontin and "sometimes refilling these prescriptions at

9   intervals of only two days, or even daily," the Ninth Circuit had no trouble concluding Feingold

10  was acting as a "drug pusher" and not at all like a doctor.  *Feingold*, 454 F.3d at 1005-06.  This

11  egregious conduct – the actions of a drug dealer in a in a white lab coat – is similar to that in

12  *United States v. Moore*, in which the Supreme Court authorized prosecution of doctors under

13  section 841.  *See* 423 U.S. at 127 n.3 (noting that Moore had prescribed over 100 Methadone

14  pills a day to one person, 70 pills a day to another, and 30-35 pills a day to a third).

15         This is nothing like what the government alleges here.  Instead, the indictment charges

16  only that the defendants dispensed controlled substances based on doctors' review of medical

17  questionnaires in the absence of in-person examinations.  To be sure, the Tenth Circuit has

18  approved a Section 841(a) prosecution on this theory.  *Lovern*, 590 F.3d at 1101.  However, the

19  Ninth Circuit never has, and the indictment's allegations are insufficient to state an offense under

20  this jurisdiction's heightened requirements.

21         The *Feingold* standard derives from two principal sources.  First, Congress did not intend

22  to criminalize physician conduct based on such an ill-defined statement as that in 21 C.F.R.

23  section 1306.04.  There is simply no indication in the language or history of the statute that

24  *Congress* intended federal rules or United States Attorneys' opinions to govern the standards of

25  medical professionals in general (*see Oregon*, 546 U.S. at 272-75), or the specific practice

26  disputed in this case.  Moreover, if anyone in the federal government were to establish

27  prescribing standards under the CSA, it would be the Secretary of Health and Human Services,

28  not the Attorney General.  *See*, *e.g.*, *id.* at 265 ("The CSA allocates decisionmaking powers

1   among statutory actors so that medical judgments, if they are to be decided at the federal level

2   and for the limited objects of the statute, are placed in the hands of the Secretary."). Finally,

3   even if Congress had intended to impose a federal standard and permitted the Department of

4   Justice to articulate it, Congress specifically *rejected* the possibility that a medical professional

5   (and by extension, business associates) could be subjected to prosecution based on the kind of

6   vague and standardless "standard" embodied in section 1306.04. *See* H.R. Rep. No. 1444, 91st

7   Cong., 2nd Sess., 1970 U.S.C.C.A.N. 4566, 4581 (Congress rejecting a Bureau of Narcotics

8   regulation invalidating methadone prescriptions issued "not in the course of professional

9   treatment" because under this standard "[t]he practicing physician has thus been confused as to

10  when he may prescribe" and been subject to criminal prosecution when the physician's "methods

11  of prescribing narcotic drugs have not conformed to the opinions of federal prosecutors of what

12  constitutes *appropriate methods of professional practice*." (emphasis added)).  It is clear

13  Congress did not intend criminal sanctions to turn on section 1306.04's vague terms, nor did it

14  intend to invite federal prosecutors to bring criminal charges to vindicate their opinions about

15  which medical practices are acceptable.  For that reason, the Ninth Circuit has held that criminal

16  charges cannot be sustained for distribution of controlled substances based on doctors'

17  prescriptions even where the doctors issuing the prescriptions commit intentional malpractice in

18  doing so. *Feingold*, 454 F.3d at 1010.

19      Second, and related, to base criminal sanctions on an after-the-fact assessment of whether

20  a prescription was issued "in the usual course of professional practice" would violate the notice

21  requirements of the Fifth Amendment's Due Process Clause, if such a prosecution could be

22  based merely on disagreement with the medical practices employed.  In *Oregon*, the Supreme

23  Court recognized that the phrase "legitimate medical purpose" is a "generality, susceptible to

24  more precise definition and open to varying constructions, and thus ambiguous." *Oregon*, 546

25  U.S. at 258.  Last term, in *Skilling v. United States*, 130 S.Ct. 2896 (2010), the Court reiterated

26  that the Due Process Clause requires that a criminal prohibition define the offense "[1] with

27  sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in

28  a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling*, 130 S.Ct.

**Michael Arnold's Motion to Dismiss**
*United States v. Napoli, et al.*, CR 10-0642 CRB        12

at 2928-29 (internal quotation marks omitted).  These requirements take on particular

constitutional relevance and practical importance when the crime charged is *malum prohibitum*

as opposed to *malum in se*.  When criminality turns on technicalities, those must be clearly

established in advance of prosecution, or be so egregious as to render them obvious violations.

In the light of the *Oregon* Court's characterization of section 1306.04, and the Court's recent

reaffirmation of the void-for-vagueness doctrine in *Skilling*, allegations that prescriptions were

issued in a manner the government disapproves cannot support criminal charges.  That is the line

*Feingold*'s "drug pusher" requirement protects.

      In sum, to allege an offense when controlled substances were dispensed pursuant to a

prescription (whether the government likes how it was issued or not), the government must

allege – more than medical negligence, and more than intentional medical negligence – that the

prescribing doctor was acting as a "drug pusher," not as a doctor.  The government here has

failed to make such an allegation.  Nothing besides the government's conclusory allegation that

"doctors . . . approved customer orders for controlled substances that were not for a legitimate

medical purpose and when the doctor was not acting in the usual course of his or her

professional practice" (Indictment, ¶ 15) even remotely approaches the prerequisites to state a

criminal offense.  The government has failed to allege the doctors writing the prescriptions at

issue in this case – upon whose authority the controlled substances were allegedly dispensed –

acted as drug pushers, or as anything other than as responsible doctors.  Nor does the

government claim that the doctors or pharmacists alleged to have worked with Mr. Arnold did

not have valid licenses, that the doctors did not actually review the medical information provided

by patients, that the doctors did not apply appropriate medical judgment to the cases they

reviewed, that the controlled substances were issued to inappropriate candidates, or that

individuals seeking medications inappropriately were not denied prescriptions.  The government

similarly fails to allege that the pharmacists who dispensed the controlled substances were not

licensed or that the medication came from an unlicensed or inappropriate source.  It does not

claim that excessive or inappropriate quantities of controlled substances were dispensed.

Instead, the government alleges only that prescriptions were issued based on patient-submitted

medical questionnaires instead of face-to-face examinations.  As much as prosecutors might disagree with this practice, the law as interpreted in this circuit did not condemn it during the period covered by the indictment.

Consequently, the indictment must be dismissed against Mr. Arnold in its entirety.

**B.    The Indictment Fails To Plead All The Required Elements Of The Charged Offenses, Thus Each Count Must Be Dismissed**

Each of the counts with which Mr. Arnold is charged contains a fatal flaw requiring dismissal.  Specifically, each fails to allege an essential element of *mens rea* required to state an offense under Ninth Circuit law.

When raised in a timely manner, "failure to recite an essential element of the charged offense is not a minor or technical flaw subject to harmless error analysis, but a fatal flaw requiring dismissal of the indictment."  *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999) (dismissing Hobbs Act conviction because indictment failed to allege an "implied" *mens rea* element); *see also* Fed. R. Crim. P. 7(c) (requiring indictment contain "statement of the essential facts constituting the offense charged").

In *Feingold*, the Ninth Circuit set out the elements of a 21 U.S.C. § 841(a) charge as it relates to controlled substances issued pursuant to a licensed doctor's prescription:

> Simply put, to convict a practitioner under § 841(a), the government must prove (1) that the practitioner distributed controlled substances, (2) that the distribution of those controlled substances was outside the usual course of professional practice and without a legitimate medical purpose, and (3) that the practitioner acted with intent to distribute the drugs **and with intent to distribute them outside the course of professional practice**. In other words, the jury must make a finding of intent not merely with respect to distribution, but also with respect to the doctor's intent to act as a pusher rather than a medical professional.

*Feingold*, 454 F.3d at 1008 (emphasis added).

Here, the section 841(a)(1) counts against Mr. Arnold (Counts Five, Six, Seven, and Eight) allege that he and others "did knowingly and intentionally distribute, and possess with intent to distribute, outside the scope of professional practice and not for a legitimate medical purpose, one or more controlled substances."  *See* Indictment,¶¶ 43, 45, 47, 49.  These charges properly allege the first and second elements identified in *Feingold*, as well as the first part of the third element.  However, the government has failed to allege that Mr. Arnold or the others acted

"with the intent to distribute [controlled substances] outside the usual course of professional practice." The *mens rea* alleged in the indictment – "knowingly and intentionally" – modifies only the allegation of distribution or possession with intent to distribute. Under no fair reading does the *mens rea* clause modify the "outside the scope of professional practice" clause. If grammatical and syntax rules leave any doubt, reference to the Ninth Circuit's formulation of the elements resolves it: When the Ninth Circuit articulated the essential elements of a section 841(a) crime in this context it repeated the *mens rea* element as to both distribution and distribution outside the course of professional practice. *Feingold*, 454 F.3d at 1008 ("government must prove . . . that the practitioner acted **with intent to distribute** the drugs **and with intent to distribute them outside the course of professional practice**") (emphasis added).

This is not a mere distinction without a difference. If the individual liberty protection of the grand jury is to mean anything, it must require, at a minimum, that an indictment allege each and every element of a charged offense. *See Du Bo*, 186 F.3d at 1179 ("The Fifth Amendment thus requires that a defendant be convicted only on charges considered and found by a grand jury. . . . Failing to enforce this requirement would allow a court to 'guess as to what was in the minds of the grand jury at the time they returned the indictment . . . .' Such guessing would 'deprive the defendant of a basic protection that the grand jury was designed to secure,' by allowing a defendant to be convicted 'on the basis of facts not found by, and perhaps not even presented to, the grand jury that indicted him.'") (internal citations omitted). In this case, there is no way of knowing whether the grand jury found probable cause to allege that the medical professionals and their business associates knew or intended to act outside the usual course of professional practice and not for a legitimate medical purpose – the central factual element presented by this case.

Failure to allege an essential element of intent is not a mere technicality; it cannot be cured by evidence adduced at trial or by jury instructions. *Du Bo*, 186 F.3d at 1180 ("Such a failure generally constitutes a fatal defect that can not be cured through jury instructions, because a completely missing essential element leaves nothing for a petit jury to ratify.") (internal

1   citation and quotations omitted).  Nor is such error subject to harmless error analysis.  *Id.* ("[T]he

2   'failure to include the element of willfulness . . . renders [an] indictment constitutionally

3   defective.'  It is not amenable to harmless error review.").

4        In sum, the government has failed to allege an essential element of a section 841(a)

5   offense, and Counts Five, Six, Seven, and Eight must be dismissed.

6        For similar reasons, Count Four, charging a violation of 21 U.S.C. section 846, must fall

7   as well.  There, the government alleges that Mr. Arnold and others "conspired to distribute, and

8   to possess with intent to distribute, outside the scope of professional practice and not for a

9   legitimate medical purpose, one or more controlled substances . . . in violation of Title 21,

10   United States Code, Section 841(a)(1)."  Indictment, ¶ 41.  The defendants named in this count

11   are alleged to have conspired to distribute controlled substances, parroting the language of the

12   statute applicable to a run-of-the-mill drug conspiracy; but in this context, without a specific

13   allegation that they intended to do it "outside the scope of professional practice," the government

14   has alleged nothing more than a standard medical business operation involving doctors,

15   pharmacists and a business entity that brings them together with patients.  Accordingly, the

16   government has failed to allege an essential element and thus failed to state a violation of section

17   846 in the special context of controlled substance dispensation pursuant to prescription.

18        Finally, in the absence of the section 841 and section 846 counts, the money laundering

19   charge in Count Nine cannot stand.  It too must be dismissed for failure to allege an essential

20   element of each of the underlying crimes.

21   **IV.    CONCLUSION**

22        For the foregoing reasons, the indictment, and each of the counts contained therein

23   pertaining to Mr. Arnold, must be dismissed.

24

25   Dated: October 27, 2010                    Respectfully submitted,

26                                              _____/s/_____

27                                              Edward W. Swanson
                                               August Gugelmann
                                               SWANSON & McNAMARA LLP

28                                              Attorneys for MICHAEL ARNOLD

**Michael Arnold's Motion to Dismiss**
*United States v. Napoli, et al.*, CR 10-0642 CRB          16